Barcalow *v.* Sanderson.

FARRINGTON BARCALOW and wife, appellants, and DAVID SANDERSON, respondent.

1. While it is the duty of the court to maintain the law against usury, and carefully to prevent its evasion, it will not enforce its severe penalties, without evidence entirely satisfactory and free from doubt.

2. Where usury is set up as a defence to the foreclosure of a mortgage, it must be satisfactorily proved by a clear preponderance of evidence in its favor. If the defendant swears to it himself, and the plaintiff denies it by his evidence, in the absence of other proof, there is no preponderance of evidence in defendant's favor, and the usury is not proved. *Dissenting opinion of* VAN DYKE, J.

3. Where, however, the defence was, that the mortgage was usurious, by reason of the complainant's having exacted from the defendant notes, amounting to $5100, as a bonus for a loan of $20,000, and that the only consideration for the notes was the loan; and the complainant, in his evidence, admits the giving and receiving of the notes, and that he neither paid, nor did the defendant receive anything for the notes, but contends that the notes were given on account of another transaction, and not on account of the mortgage in question, the burthen of proof, that the notes were given and received in another transaction, is shifted to the complainant. If he admits facts which, *prima facie*, establish the usury, but seeks to avoid that conclusion by alleging new matter, he must establish such new matter by a clear preponderance of proof in its favor. *Dissenting opinion of* VAN DYKE, J.

This was an appeal from an interlocutory decree of the Court of Chancery, made in a foreclosure suit, wherein the respondent to this appeal was complainant. The complainant was adjudged to be entitled to the relief prayed for in his bill, and it was referred to a master to ascertain the amount of principal and interest due to him upon his mortgage. The defendant, conceiving that usury had been clearly shown, appealed from the decree. The facts of the case sufficiently appear in the opinion of the court.

*Mr. Ranney, Mr. Bradley*, and *Mr. Gilchrist*, for appellant.

*Mr. J. V. Voorhis, Mr. A. O. Zabriskie*, and *Mr. Williamson*, for respondent.

The opinion of the court was delivered by

ELMER, J. The appellants, who were the defendants in the Court of Chancery to a common mortgage bill, have set up the defence of usury, and insist that their mortgage, dated November 18th, 1854, to secure the payment of $20,-000, on the first day of January, 1858, with lawful interest, is for that reason void. Both parties were examined as witnesses, and as so often happens, tell entirely different stories. That the testimony of Barcalow ought not to be relied on as sufficient, of itself, to sustain his defence, is evident, not only because of the great danger of permitting a debtor to swear himself clear of a large debt, for which he has given his bond, but because in this case, it appears that after swearing in his answer to certain important statements, he reiterated them on his examination and cross-examination, in the most positive manner, and was subsequently compelled to admit that he was mistaken, and this mistake, if a mistake it was, as we may charitably believe, was in reference to transactions, it seems almost incredible that he could have forgotten.

As to the testimony of the appellant's hired man, who

2Q*

swears that he was hidden in the upper story of his office, wrapped in a buffalo skin, for the purpose of listening to a conversation between these parties through a scuttle-hole in the ceiling, so far from being entitled to credit, in my opinion, taints the whole defence with strong suspicion.

But it is insisted for the appellants, that the statements of the complainant himself, taken in connection with the testimony of Gaston and McGraw, who are unimpeached witnesses, are sufficient to show that the transaction between the parties was, in fact, usurious, and this is the important question to be decided. That the mortgage was given to secure a loan of money is clear. The complainant held the defendant's paper, upon which there was due between six and seven thousand dollars. The latter was engaged in carrying on the lumber business at Somerville, in partnership with one Lindsley, and was desirous of purchasing out his interest in the concern, or of procuring some other person to do so, who had sufficient capital to enable him to go on with the business. It was proposed that the complainant should become the purchaser, and should make a loan to the defendant of $20,000, which, it would seem, he agreed to do.

The bond and mortgage in controversy were executed at the office of Mr. Gaston, in Somerville, on Saturday, November 18th, on which day they bear date. Gaston was the attorney employed by the defendant, but acted in this business for both parties. He states that the papers were left in his office, as the parties had to go to New York to do something connected with the business. On Monday, the 20th, they met in New York, and the manner in which the loan should be made was arranged. Notes of Barcalow himself were given, payable to the order of complainant, dated January 22d, 1854, and payable at from ten to fourteen months, for the aggregate amount of about $11,527, which complainant endorsed, and defendant retained or made use of. Instead of the complainant becoming the purchaser of Lindsley's interest in the partnership business, the defendant purchased it himself, and on the same day he made six

promissory notes to the complainant, for eight hundred and fifty dollars each, bearing different dates, but payable, one on the first day of January, 1856, and the others at the expiration of each succeeding six months.

It is alleged by the defendant, that these notes were given as a bonus for the loan of the $20,000, while the complainant insists they were in lieu of the profits of the partnership into which he expected to enter with Barcalow, and which he had been assured would, judging from the past, much exceed their amounts.

Lindsley, who had conveyed to Barcalow his interest in half the real estate owned by the partnership, at Somerville, on the 16th of November, two days before the execution of the mortgage, and who made him a bill of sale for the lumber, &c., on the 20th, was not examined. McGraw, who had been the partner of Barcalow in the business at one time, and sold out to Lindsley, who seems to have been largely indebted to him, and in whose office much of the negotiation took place, gives us but little precise information, and is indeed accused by the counsel on both sides, of not willingly disclosing what he really knew. The result of his statements of what Sanderson told him, as summed up by himself, is, "that Mr. Sanderson had talked of going into the business as a partner, and preferred to furnish this amount of money and let him have the business himself. These notes, as I understood it, were for anticipated profits in the business."

That the complainant was originally induced to make the loan, not only because he was the friend of Barcalow and accustomed to lend him money and held his paper, but also in consideration of the profit he then anticipated from the business of the partnership into which it was proposed he should enter, appears to be highly probable, and may be safely assumed. This, however, if he was intended to be truly a partner, and that relation was not to be a mere sham to cover a usurious bargain, of which there is no sufficient proof, was not usurious. The more important question is, did the substitution of the notes make the contract usurious? In my

opinion it did not, if the transaction was, in fact, a *bona fide* purchase by Barcalow of the complainant's right or intention to interfere with his desire of obtaining Lindsley's interest in the partnership, on terms he considered advantageous. While it is the duty of the court to maintain the law against usury, and carefully to prevent its evasion by any shift, covin, device, contrivance, or deceit, we are not called on to enforce its severe penalties, without evidence entirely satisfactory and free from doubt. The strong probability in this case is, that while Sanderson was willing to lend his money if he could participate in the profits of the lumber business, Barcalow was willing to pay him the amount of the notes, to get rid of competiton for the purchase from Lindsley, and that Sanderson preferred this arrangement. There is no satisfactory evidence that Sanderson made it a condition of the loan, that he should have these notes, or that they were necessarily connected with it. Sanderson, himself, says the notes were given to him for Lindsley's interest, and to assist Barcalow by way of lending him money at times, if he had any to spare. This statement, it is urged, is of itself proof of usury, inasmuch as when the notes were given, he had not advanced all the money to complete the loan for which the mortgage was given. It is clear, however, I think, that taking all he says on this subject together, which for the fair understanding of his statement we ought to do, he did not mean that the notes were in consideration of any part of the loan then agreed upon, but as an inducement for him to make future loans.

After their return from New York, the parties met again at the office of Mr. Gaston, and the complainant signed an agreement respecting some mortgages assigned to him as collateral securities, and an engagement to pay the notes of Barcalow, which he had endorsed in New York, as they should successively mature, and they adjusted the balance due and the interest and rebate on the several notes and debts between them, and closed the transaction. The defendant alleges that the interest was then calculated at seven per

Barcalow *v.* Sanderson.

cent., and that this infected the whole loan with usury. But how this calculation was made does not appear. It certainly will not do to rely upon imaginary figures on either side, especially as both parties insist upon mistakes, and cannot otherwise produce the desired result.

In my opinion, the decree of the Chancellor should be affirmed.

VAN DYKE, J., dissenting. The suit in this case is brought to foreclose a mortgage for the sum of twenty thousand dollars. The defense to it is that of usury. The amount in question is so great, and the consequences to the complainant of such magnitude, that we almost shrink from an examination of the evidence which goes to sustain this defence; and yet, in proceedings where life is at stake, we do not expect either court or jury to hesitate in reaching the conclusion to which the law and the evidence clearly point, no matter how sad the consequences may be to the party on trial. So in the case before us, where the law against usury is quite as positive as it is against murder, if the usury be proved according to the well established laws of evidence, it is our imperative duty so to decide, without any reference to the consequences which may result to the parties.

The mortgage in question is made up of different sums of money added together. Some of these were moneys due from the defendant to the complainant for money borrowed, and otherwise, previous to the making of the mortgage; some for money advanced at the time; and some for notes of the defendant endorsed by the complainant, which he was to pay, and which he did pay, at maturity.

The usury charged is of a two-fold character. First, it is alleged that on the moneys due from the defendant to the complainant, previous to the execution of the mortgage, and which formed a part of it, amounting to $6912.71, a usurious interest of seven per cent. per annum had been reserved and paid; and secondly, that in negotiating and completing the entire loan of $20,000, a bonus for such loan, of $5100, was

agreed upon between the parties, to be paid by the defendant to the complainant, and that such bonus was accordingly paid.    If either of these charges be true in fact, no matter in what garb the transactions may have been dressed, or how mysterious, equivocal, or cabalistic, the language may have been which was made use of, the transaction was unquestionably usurious, and the complainant should not be permitted to recover.

With regard to the first charge, it is proved, in some of its features, at least so far as language goes, by the testimony of the defendant; but it is with quite as much positiveness disproved, so far as language goes, by the complainant in his evidence; and this is all the testimony, I believe, that we have on that part of the subject.    If this were the only question in the case, it should give us but little trouble.    It would be settled by a well known rule of law, without going into any examination of the credibility of the witnesses or the force of their evidence.    The usury is set up by the defendant, and he must prove it satisfactorily, that is to say, he must throw a clear preponderance of evidence in his favor. If he swear to it himself, and it is not contradicted or denied by the complainant, or by other evidence, or is so equivocally denied as to amount to an admission of its truth, then there is a preponderance of evidence in favor of the defendant; but where the defendant swears to it, and the complainant, by his evidence, denies it, there is no preponderance in the defendant's favor, and the usury is not proved, and we cannot lawfully determine that it is.    This seems to be the case in reference to the first feature in the alleged usury.    It is not proved.

In regard to the second feature of the alleged usury, viz. that the complainant received a large bonus for the loan of the $20,000, it seems to me the case is entirely different. This charge is explicitly set out in the answer.    The defendant, in his evidence, swears to it, not only with positiveness, but he furnishes, in the notes given at the time, the mode and manner in which it was done, while the complainant, in

his evidence, as clearly testifies that he did, at the time of taking the mortgage, receive the identical $5100 mentioned by the defendant, in precisely the same way and manner as he described it. And he also admits and testifies that he never did pay or advance, and never was to pay or advance, one farthing of consideration, either in money or other property, to the defendant or any one else, for the said sum of $5100, and that the defendant never did receive, and never was to receive, any such consideration therefor. It is true he testifies that this alleged bonus, paid originally in notes, was given in an entirely different transaction; but it does seem to me, that when the defendant, by his testimony and corroborating exhibits, has made out a clear *prima facie* case of the bonus paid, with the circumstances of time, place, and manner, and when the complainant admits that amount paid, at the time and place, and in the manner stated, and that they were the time and place when and where the mortgage loan was itself consummated, and that he never paid or advanced any consideration whatever for such money, but sets up that he received it upon some other transaction—it seems to me, I say, that under such circumstances, the burden of proof thereafter has changed, and rests upon the complainant. He does not in this respect deny what the defendant has said, but he admits it, and sets up a new matter, to which the defendant has not in his evidence referred. It is new matter, too, by which he must escape, if at all, for without it the case is clearly and strongly against him, and it becomes his duty to establish it by placing a preponderance of testimony in its favor. If either party to a suit sets up a promissory note, and the execution of it is denied, the party offering it is bound to prove it; but if the execution be admitted by the adverse party, who claims that he has paid it, the burden of proving such payment rests upon the party who claims the benefit of it. The analogy of such a case to the one before us is, so far complete as to impose upon the complainant, who sets up this new fact, by which alone he hopes to protect himself, the necessity of proving it, by at least furnishing a preponderance

of evidence in its favor. Has he done so ? Taking the evidence as it stands before us, he certainly has not. He says himself, in his evidence, that the fifty-one hundred dollars was not a bonus for the loan of the $20,000, and that the notes given for that sum were not bonus notes, but were given for a different purpose. This is all the definite evidence we have on that subject, on the part of the complainant. The defendant, in his evidence, as we have seen, states directly to the contrary, and thus, without reference to any other testimony, the evidence seems balanced, without a preponderance on either side, for there is nothing in the evidence furnished, outside of the parties themselves, which shows that any more credit is to be given to the one party than to the other. The defendant is no more interested in defeating this claim than the plaintiff is in sustaining it; perhaps not so much so, for the complainant, in addition to his pecuniary interest, has his character to sustain against the charge of being a usurer.

But suppose I am wrong in saying that the burden of proof is shifted from the defendant to the complainant, in consequence of his admissions before mentioned, and that it still rests on the defendant, is there not positive and distinct evidence in the case, from disinterested witnesses, which goes to corroborate and confirm the testimony of Barcalow, and contradict that of Sanderson, and which shows a clear preponderance of testimony on the part of the defendant, showing these to be in fact bonus notes given as a consideration for the loan, and without which it would not have been made?

It will be borne in mind that we are a tribunal of fact as well as of law, which is to examine, construe, and weigh the evidence, and give to it its legal force and effect, the same as the Chancellor, or a jury might do, if such case were before them.

In corroboration, then, of the defendant, we have the evidence of John McGraw. He seems to have been familiar with the parties, and with their business. He was present at the meeting when it is conceded these notes were given,

and although it does not clearly appear that he saw them, yet he learned from the parties that they were given, and from both of them he learned the purpose for which they were given.  He says, in answer to a question, that he understood from the parties that they were given in connection with this loan.  Sanderson says they were entirely a different transaction, given to him for Lindsley's interest, and to assist him in loaning him money at times, if he had any to spare, after he had purchased out Lindsley's interest.  In answer to other questions, McGraw says that he understood from both the parties, at the time, that these notes were given in consideration of the furnishing this $20,000.  This is certainly in direct conflict with Sanderson, and in corroboration of Barcalow, and if true, so far as language can do so, establishes usury.

I am aware that McGraw, in answer to another question, expressed a view which seems to sustain the position taken by the complainant and his counsel, and I will refer to it in another aspect of the case.  But there is other evidence, sustaining the defendant and contradicting the complainant, which I think we are not at liberty to disregard.  The testimony of John H. Whitenach has been fiercely assailed, not because he is not a respectable person or a credible witness, but because of the manner in which he obtained his knowledge; not because he has made himself officious, or shown an undue interest in the case, but because he consented, at the request of his employer, to place himself in a position to overhear the conversation of the parties; but the question is not whether the mode of learning the conversation was commendable or not, but whether the witness tells the truth or not as to what he heard and saw.  What reason have we to suppose that he perjured himself?  If the object was to have him do this, and he was willing to undertake it, it would have been much easier to have him say at once that he was present in the office, and heard the conversation which he describes.  If he had done this there would have been no objection to the manner of obtaining the knowledge, and we

would have had no more reason to suspect the truthfulness of his statement than we have to suspect the truthfulness of the statement of McGraw, that he learned similar things from the conversations of both the parties; and, although every opportunity existed to impeach his evidence, by showing that he was unworthy of belief when under oath, yet no attempt was made to do so, although the nature of his testimony, if true, was very important in the case; and we are bound to suppose that no such effort would have been successful if it had been attempted.

An effort is made, however, to show that Sanderson was, at the time named, not at Somerville, but at his home, some seven or eight miles off, but this entirely failed.    There is some evidence that he was at home in the after part of the day, and then left for New York, arriving there about nine o'clock in the evening; but there is *no* evidence to show that he might not very easily have taken a train of cars to Somerville, and another one back again in the forenoon of that day.

On the other hand, the testimony of Whitenach, on the point of Sanderson being in Somerville and at Barcalow's office on that day, is confirmed by evidence more reliable than the mere memory of witnesses as to dates.    The witness, Thomas Rogers, says he was at Barcalow's office on the 10th of January, and saw Sanderson there; and in confirmation of this he says it was a very cold day, and he asked Barcalow to give an order for some coal; he gave him the order, and he took it to Manning's and got the coal. Manning produces this order, in the handwriting of Barcalow, and it is entered in his book of sales, on the 10th of January, 1859, the day mentioned by Whitenach.

Whatever we may think then, of the propriety of the mode of reducing the admissions of the defendant to evidence, there is no legal reason for rejecting his testimony as false, any more than that of any other witness; and unless we really and conscientiously believe it, and for sufficient cause, to be untrue, we cannot legally reject it merely on the ground of the impropriety of the manner in which it was obtained.

Taking it, then, as evidence in the cause, it does in its terms certainly corroborate the testimony of Barcalow, and contradict that of the complainant, for he says that he heard Sanderson state, in reference to a loan of $20,000, that the bonus was $5000, in six notes of $850 each, given when the money was loaned. This, with the evidence of McGraw, places a clear and decided, as well as legal preponderance of evidence on the side of this defence.

But suppose we look at this case from the point of view presented by the complainant, are we not necessarily forced to the same conclusion?

The position taken by Sanderson, in his evidence, is that he had agreed with Barcalow not only to lend him the $20,000, but to purchase the interest of Lindsley besides, and become a partner in the business, and he says that he did not understand to the contrary until he saw Barcalow in New York, on the 20th of November, 1854, when he told him he desired to purchase it himself; that the partnership idea was then given up, and that Barcalow then, for the first time, offered and actually gave him the $5100, to relinquish his claims to be a partner, or, as it is insisted, to compensate him, in some measure, for the profits which he might have recieved if he had become a member of the firm. The whole of his testimony on this subject presents a rather remarkable statement of facts. In 1853, when solicited by McGraw, and spoken to by Barcalow, simply to purchase McGraw's interest in the lumber business, not to loan $20,000, or any other sum, he declined to do so, on the ground that he had not the means, although he had then sold out his staging business, and wanted to invest his money; and yet, in the year after, he not only agreed to purchase the interest of McGraw, which had then passed to Lindsley, but to loan Barcalow $20,000, besides. And although he says that he had all the funds with him at Somerville, either in cash or in checks, on the 18th of November, 1854, to pay the whole balance to be advanced on the mortgage, and at a time when he was expecting also to buy out the interest of Lindsley, yet two days thereafter,

at New York, when he had abandoned the idea of purchasing Lindsley's interest, he advanced no money on the mortgage at all, but, instead thereof, endorsed the notes of Barcalow on long time, and paid them off as they became due.

It appears, too, by this testimony, that Sanderson, in addition to the mortgage of $20,000, had contracted for Lindsley's interest, and that the contract was so obligatory that Barcalow was forced to give him $5100 to buy him off from it. Yet all this time Lindsley, the owner of this interest, had never been spoken to on the subject, nor had the price which Sanderson was to pay for it, ever been named by any one, and yet he had agreed to take it without regard to the price.

We learn too, by this evidence, another curious fact, that Barcalow was very solicitous and urgent to get Sanderson into the firm; but as soon as he agreed to go in, he voluntarily gave him $5100 to have him stay out, Sanderson asking $6000, more than half of all that Lindsley's interest brought, either in 1853 or in 1854; and finally we are told that Barcalow, either through folly or benevolence, or from some other cause, voluntarily agreed to pay, and did pay, nearly $17,000 to get Lindsley's interest, when he might have got it for between eleven and twelve thousand, and that he paid him $5100, on account of future profits from a concern in which Sanderson had no interest whatever, to which he had never contributed a farthing, on account of which he had never put himself to the slightest inconvenience, on which he had no claim whatever, and which Barcalow, whom the counsel call smart, was under no obligation to pay.

Now is it possible to believe all this, even if Barcalow, McGraw, and Whitehead had not contradicted it? Sanderson here expressly admits that he received all this money, and at the time when the loan was finally adjusted, but can any one believe that it had nothing to do with that loan, or that it would ever have been paid at all, if that loan had never been made? There can be but little if any doubt that the transaction was spoken of in the way mentioned. The parties,

when speaking of the subject in the presence of others, probably did not in terms call the money bonus money, nor the notes bonus notes, but they spoke of them as anticipated profits from the lumber business. Hence McGraw, when he says he understood from both the parties that these notes were given in consideration of his furnishing this loan of $20,000, yet that it was not said in that language, but that Sanderson had talked of going into partnership, and was to furnish about $20,000 in money, but on reflection he objected to going into partnership, and preferred to furnish this amount of money, and let Barcalow have the business himself, and that these notes were for anticipated profits in the business. Profits, to be sure, from a firm to which he had not only contributed nothing, but into which he himself, as McGraw says, *refused* to enter.

This same idea of calling this extra money profits, and not a bonus, is also found in the defendant's answer, prepared before we had any evidence on the subject. He there sets up that the complainant was at first induced to enter into partnership with him by the purchase of Lindsley's interest, and consented to do so; but becoming dissatisfied, he proposed to loan the defendant sufficient money to enable him to purchase such interest, provided he could receive a bonus of $1700 per year for three years, " in lieu of a portion of the profits of said concern and business."

It appears then, not only by the evidence of Barcalow, but by that of McGraw also, that Sanderson was unwilling to enter into this partnership; and if we throw out of view the testimony of both Sanderson and Barcalow, we still have it proved by the evidence of McGraw, that Sanderson declined going into this firm as a partner. And if he declined to go in, we cannot possibly suppose that Barcalow paid him the $5100 to stay out, or that he paid it on account of any supposed profits to which Sanderson could by any possibility have been entitled. But still he paid it, and for what did he pay it? For what could he have paid it, except as a consideration for this large loan of money? And it can make no

2 R*

difference what kind of circumlocution or indirection was adopted, or what mystic language was employed, or to what extent they called things by strange or fictitious names; if the real fact was that it was paid on account of, or as an inducement to this loan, the transaction was clearly usurious. And from this conclusion I see no means of escape, as I am forced to the conclusion that this money would never have been paid if this loan had never been made.

It was insisted, however, on the argument, that the whole evidence of Barcalow is seriously impaired by the fact, that through mistake, or for some other reason, he testified that the note for $4112.71, held by Sanderson against him and McGraw, had been given directly from them to him, whereas it appears that it was given originally to E. S. Doughty, and was by him endorsed to Sanderson. I am not able to see the matter in the light contended for, for, in the first place, I can see no possible object that he could expect to gain by intentionally making any such false statement. In the next place, to suppose that he would wilfully pervert the truth in this respect, when he knew that the complainant held the note, and had only to produce it to overwhelm him in a serious contradiction, is not to suppose him a knave merely, but to make him out a natural fool. With being this the counsel have not charged him. Then again, he did not wait to see the result of his experiment, if it was one, but as soon as he saw a memorandum which he afterwards found among his papers, he was convinced of his mistake and took immediate steps to have it corrected. This conduct is consistent with honesty, but . scarcely so with dishonesty. Had he waited until detection confronted him, and then attempted his explanation, it might have been otherwise.

I can see too, how he could easily be mistaken as to the particular form of this note, as well as to its origin. He knew that the complainant had frequently loaned him, or him and his partner, money, and had frequently held their notes. He knew that the complainant held the note in question, and had held it for the last ten years, but he probably had not seen it since the last endorsement of interest upon it,

which was in June, 1854, more than eight years previous to the time when he testified. And as he was not permitted to see the note, nor asked the question whether it had not been given originally to Doughty, by which his memory would have been refreshed, it does not seem very strange that he was under the confident belief that it was given directly to the complainant instead of to Doughty. It is a mistake which any one in the habit of dealing very loosely with another might have made. It was corrected in a very manly way, as soon as discovered, and I do not see how it should reflect seriously upon either his integrity as a witness or the general correctness of his memory.

I think, therefore, that by all the rules of law and evidence, and in any aspect in what we can view the case, the usury set up is fully proved, and that the complainant should not recover.

The decree of the Chancellor was affirmed by the following vote:

*For affirmance*—COMBS, CORNELISON, ELMER, FORT, OGDEN, WALES, WOOD. 7.

*For reversal*—KENNEDY, VAN DYKE, VREDENBURGH. 3.